IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DEBORAH SABO,** | ) **Case No. 3:17-cv-135** |
| | ) |
| | ) |
| **Plaintiff,** | ) **JUDGE KIM R. GIBSON** |
| | ) |
| **v.** | ) |
| | ) |
| **UPMC ALTOONA,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Before the Court is Defendant UPMC Altoona's Motion for Summary Judgment. (ECF

No. 30.) This Motion is fully briefed and is ripe for disposition. (*See* ECF Nos. 31-33, 44-46, 51-

53, 58-59.) For the following reasons, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    Background

### A.    Factual History[1]

The following facts are undisputed unless otherwise noted. The Court includes additional

material facts in Section IV where necessary.

### 1.    Sabo's Employment at UPMC Altoona and its Predecessors

Plaintiff Deborah Sabo began work at Altoona Hospital—which later became UPMC

Altoona—as a nutrition specialist in March of 1998. (ECF No. 32 ¶ 1; ECF No. 44 ¶ 1.) In 2008,

---

[1] The Court derives these facts from a combination of UPMC's Concise Statement of Material Facts (ECF No. 32), the Appendix attached to UPMC's Concise Statement of Material Facts (ECF No. 33), Plaintiff's Response to Plaintiffs' Concise Statement of Material Facts and New Matter (ECF No. 44), the Appendix to Plaintiff's Response to Motion for Summary Judgment (ECF No. 46), and UPMC's Reply to Plaintiff's Concise Statement of Material Facts (ECF No. 52).

Sabo was promoted to certified dietary manager. (ECF No. 32 ¶ 2; ECF No. 44 ¶ 2.) As a certified dietary manager, Sabo supervised food-preparation employees and oversaw food service, sanitation, food procurement, and storage. (ECF No. 32 ¶ 3; ECF No. 44 ¶ 3.)

Sabo worked in UPMC Altoona's nutrition services department. (ECF No. 32 ¶ 4; ECF No. 44 ¶ 4.) The nutrition services department at UPMC Altoona was overseen by Robert Strawser, the executive director of missions and patient experience at UPMC Altoona. (ECF No. 32 ¶ 9; ECF No. 44 ¶ 9.) From 2008 until 2014, Sabo reported to Debra Finochio, the director of UPMC Altoona's nutrition services department. (ECF No. 32 ¶ 4; ECF No. 44 ¶ 4.) After Finochio's retirement in 2014, Sabo reported to Dona Baughman, who replaced Finochio as director of the nutrition services department. (*Id*.)

In February of 2013, UPMC Altoona's nutrition services department hired Keith Auker as executive chef. (ECF No. 32 ¶ 13; ECF No. 44 ¶ 13.) Auker was in charge of "all things food," including planning menus, ordering and preparing food, and executing VIP events and executive functions. (ECF No. 32 ¶ 15; ECF No. 44 ¶ 15.) The parties dispute whether Sabo performed Auker's job duties before he started working at UPMC Altoona. (ECF No. 32 ¶¶ 16-19; ECF No. 44 ¶ 16-19.)

## 2.    Sabo's Job Performance and Experience at UPMC Altoona

As Sabo's direct supervisor, Finochio completed performance reviews for Sabo from 1998 until November of 2014. (ECF No. 32 ¶ 20; ECF No. 44 ¶ 20.) Supervisors rated employees on a one-to-five scale with one being the lowest rating and five being the highest. (ECF No. 32 ¶¶ 24-26; ECF No. 44 ¶ 24-26.) The parties do not dispute that performance reviews factored in whether employees achieved "personal goals"—long term goals that employees established for

themselves. (ECF No. 32 ¶¶ 23-25; ECF No. 44 ¶¶ 23-25.) However, the parties dispute exactly what personal goals were and how the achievement of personal goals was factored into employee performance reviews. (*Id.*)

From 2009 until 2013, Sabo received "consistently relatively strong" performance reviews. (ECF No. 32 ¶ 27; ECF No. 44 ¶ 27.) The parties agree that Sabo was a well-liked and good employee. (ECF No. 52 ¶ 18.) Sabo received a 3.7 rating for 2009-2010, a 3.8 rating for 2010-2011, a 4.0 rating for 2011-2012, and a 3.75 rating in 2012-2013. (*Id.*) Defendant alleges that Sabo received a 2 out of 5 rating in a category of her 2012-2013 performance review because she did not meet one of her personal goals. (ECF No. 32 ¶ 28.) Sabo disputes this fact, and asserts that "Finochio gave Sabo a 2 out of 5 because [Sabo] had taken time off." (ECF No. 44 ¶ 28.)

As a result of Sabo's "great score" on her 2012-2013 performance review, Sabo received a salary increase and a lump-sum bonus. (ECF No. 32 ¶¶ 31-32, 34-36; ECF No. 44 ¶¶ 31-32, 34-36.)

Sabo took leave under the Family and Medical Leave Act ("FMLA") twice during her employment at UPMC Altoona. (ECF No. 32 ¶ 40; ECF No. 44 ¶ 40.) First, Sabo took FMLA leave in 2012 for approximately three months due to anxiety and depression. (ECF No. 32 ¶ 41; ECF No. 44 ¶ 41.) Defendant alleges that Sabo's managers and supervisors did not know that she suffered from depression and anxiety. (ECF No. 32 ¶ 42.) Sabo disputes that fact by alleging that Baughman knew of Sabo's history of depression. (ECF No. 44 ¶ 42.) Sabo did not seek accommodations after her 2012 FMLA leave. (ECF No. 32 ¶ 48; ECF No. 44 ¶ 48.)

Sabo also took FMLA leave in 2013 for approximately four months due to spinal stenosis. (ECF No. 32 ¶ 43; ECF No. 44 ¶ 43.) Finochio and Baughman knew that Sabo's 2013 FMLA leave was related to a neck injury. (ECF No. 32 ¶ 44, 46; ECF No. 44 ¶ 44, 46.) After her 2013 FMLA

leave, Sabo requested that she not be required to lift more than 10 pounds. (ECF No. 32 ¶ 49; ECF No. 44 ¶ 49.) UPMC Altoona accommodated Sabo's request. (*Id.*)

Sabo complained to her superiors and human-resources employees about three issues throughout her employment.

### a. Sabo Complained About Her 2012-2013 Performance Review

First, Sabo complained about her 2012-2013 performance review. (ECF No. 32 ¶¶ 52-68; ECF No. 44 ¶¶ 52-68.) Sabo left a voicemail message with Finochio complaining about her receiving a 2 out of 5 in an individual category of the 2012-2013 performance review. (ECF No. 32 ¶ 52; ECF No. 44 ¶ 52.) Finochio told Sabo not to worry about the individual category because her overall score was high. (*Id.*) Sabo alleges that Finochio told Sabo that her 2 out of 5 score was due to Sabo's taking FMLA leave. (ECF No. 44 ¶ 52.) The parties agree the Finochio mentioned Sabo's FMLA leave in the 2012-2013 performance review. (ECF No. 52 ¶ 33.)

Sabo met with Finochio on February 11, 2014 to discuss Sabo's concerns about her 2012-2013 performance review. (ECF No. 32 ¶ 55; ECF No. 44 ¶ 55.) At that meeting, Sabo told Finochio that she believed Finochio was retaliating against her for utilizing FMLA leave. (*Id.*) Finochio denied Plaintiff's allegation. (ECF No. 32 ¶ 56; ECF No. 44 ¶ 56.)

Finochio contacted Strawser (UPMC Altoona's executive director of missions and patient experience) and John Kepler, UPMC Altoona's director of human resources, about Sabo's complaint regarding her 2012-2013 performance review. (ECF No. 32 ¶ 57; ECF No. 44 ¶ 57.) Strawser and Kepler determined that Sabo's complaint was meritless because (1) the overall score for her performance review was high, and (2) Sabo was unable to meet her personal goals while missing work. (*Id.*)

Finochio and Kepler then decided to refer Sabo to UPMC Altoona's employee assistance program (EAP), which provided counseling to employees. (ECF No. 32 ¶ 58; ECF No. 44 ¶ 58.) UPMC Altoona claims that Finochio and Kepler made this decision because Sabo exhibited a "level of continued distress." (*Id.*) Sabo states that the referral was based on Sabo becoming "emotional" when Strawser and Finochio refused to consider her complaint about FMLA leave. (*Id.*)

On February 18, 2014, Sabo met with Finochio and Strawser. (ECF No. 32 ¶ 61; ECF No. 44 ¶ 61.) At that meeting, Sabo, Finochio, and Strawser discussed Sabo's 2012-2013 performance review and her referral to EAP. (ECF No. 32 ¶ 62; ECF No. 44 ¶ 62.) Sabo became emotional when she learned that Strawser and Finochio would not change her 2012-2013 performance review. (ECF No. 52 ¶ 47.) After that meeting, Sabo attended EAP and Finochio opined that the situation had improved. (ECF No. 32 ¶ 63; ECF No. 44 ¶ 63.)

Sabo also complained about her 2012-2013 performance review at a meeting with Sarah Greene, a human resources manager for UPMC Altoona, on October 9, 2014. (ECF No. 32 ¶ 65; ECF No. 44 ¶ 65.) Sabo drafted a follow-up email to Greene after the meeting, but never sent it. (ECF No. 52 ¶ 56.)

The parties dispute whether Sabo complained about the 2012-2013 performance reviews to Baughman or other supervisors. (ECF No. 32 ¶¶ 66-68; ECF No. 44 ¶¶ 66-68.)

b.  **Sabo Complained About Logging Time**

Second, Sabo complained about Executive Chef Auker at her October 9, 2014 meeting with Greene. (ECF No. 32 ¶¶ 69-76; ECF No. 44 ¶¶ 69-76.) Sabo complained that she was required to log her time each workday while Auker, the newly hired executive chef, was not required to log

his time. (ECF No. 32 ¶¶ 70-71; ECF No. 44 ¶¶ 70-71.) Defendant alleges that Greene did not interpret Sabo's comments as complaints about sex discrimination, but Sabo contends that her statements "clearly regard[ed] sex discrimination." (ECF No. 32 ¶¶ 73-75; ECF No. 44 ¶¶ 73-75.) When Baughman became director of the nutrition services department in 2014, Sabo was no longer required to log her time. (ECF No. 32 ¶ 76; ECF No. 44 ¶ 76.)

### c. Sabo Complained About Communication Issues with Baughman

Third, Sabo complained about communication issues with Baughman after Baughman took over for Finochio as director of the nutrition services department in 2014. (ECF No. 32 ¶¶ 77-80; ECF No. 44 ¶¶ 77-80.) Sabo informed Greene of her issues communicating with Baughman. (ECF No. 32 ¶¶ 77-78; ECF No. 44 ¶¶ 77-78.) In response, Greene held weekly "huddles" to address the communication issues. (ECF No. 32 ¶ 79; ECF No. 44 ¶ 79.) Greene received a similar complaint from another employee named Betsy Lynch. (ECF No. 32 ¶ 80; ECF No. 44 ¶ 80.)

### 3. Sabo's Termination

In March of 2015, UPMC Altoona informed Baughman of a "reduction in force." (ECF No. 32 ¶ 81; ECF No. 44 ¶ 81.) UPMC Altoona required Baughman to reduce the workforce in the nutrition services department by four percent, which translated to four full-time employees. (*Id.*) Baughman determined the positions that would be eliminated. (ECF No. 32 ¶ 84; ECF No. 44 ¶ 84.) Baughman chose to eliminate a certified dietary manager, nutrition services supervisor, and part-time clerical assistant. (*Id.*)

Defendant alleges that Baughman used seniority to determine who would be terminated where there was more than individual in each position. (ECF No. 32 ¶ 85.) Sabo alleges that "Baughman used seniority as a pretext to 'get rid' of employees who used FMLA or extended

leave." (ECF No. 44¶ 85.) The parties disagree about the decision-making process Baughman used to eliminate positions. (ECF No. 32 ¶¶ 86-87; ECF No. 44 ¶¶ 86-87.) The parties also disagree about how Baughman communicated her decision to her superiors and whether Strawser was involved. (ECF No. 32 ¶¶ 86-87, 89; ECF No. 44 ¶¶ 86-87, 89.)

Sabo lost her job as a result of the 2015 reduction in force. (ECF No. 32 ¶ 93; ECF No. 44 ¶ 93.) Defendant alleges that Sabo was the least senior certified dietary manager in UPMC Altoona's nutrition services department. (ECF No. 32 ¶¶ 92, 94.) Sabo, however, maintains that she had the same level of seniority as another certified dietary manager, Julie Fornwalt. (ECF No. 44 ¶¶ 92, 94.) Sabo argues that she and Fornwalt were promoted to certified dietary manager at the same time in 2008, and that they had different roles within the certified dietary manager position.[2] (*Id.* ¶¶ 92-94.)

UMPC Altoona staff notified Sabo of her termination at 10:00 a.m. on August 5, 2015. (ECF No. 32 ¶ 99; ECF No. 44 ¶ 99.) Greene, Strawser, Baughman, and a human resources representative named Jennifer Hatajik attended the meeting. (ECF No. 32 ¶ 100; ECF No. 44 ¶ 100.) One of these staff members told Sabo that she was being terminated and explained the benefits packages that would be available to her. (ECF No. 32 ¶ 102; ECF No. 44 ¶ 102.)

Baughman accompanied Sabo to her office as Sabo collected her belongings. (ECF No. 32 ¶ 104; ECF No. 44 ¶ 104.) Sabo insulted Baughman and stated that she wanted to kill herself. (ECF No. 32 ¶¶ 105-06; ECF No. 44 ¶¶ 105-06.) At some point, Strawser approached Sabo's office.

---

[2] Sabo alleges that as certified dietary managers, she more specifically acted as patient services manager while Fornwalt acted as retail services manager. (ECF No. 44 ¶ 92.)

(ECF No. 32 ¶ 108; ECF No. 44 ¶ 108.) Baughman communicated Sabo's threat to Strawser as a "statement that Plaintiff would be better off dead." (ECF No. 32 ¶ 108; ECF No. 44 ¶ 108.)

Strawser and Baughman escorted Sabo to her car. (ECF No. 32 ¶ 109; ECF No. 44 ¶ 109.) Sabo was upset as she left the building and informed other UPMC Altoona employees that she had been fired. (ECF No. 32 ¶¶ 110-14; ECF No. 44 ¶¶ 110-14.) On the way to her car, Sabo told Baughman and Strawser "that her job was her life" and that "she might as well just end it." (ECF No. 52 ¶ 122.) She refused help from Strawser and left the premises. (ECF No. 32 ¶¶ 112-14; ECF No. 44 ¶¶ 112-14.)

#### 4. The Aftermath of Sabo's Termination

After they escorted Sabo off the UPMC Altoona premises, Strawser and Baughman again met with Greene and Hatajik. (ECF No. 32 ¶ 116; ECF No. 44 ¶ 116.) The four decided to call the UPMC Altoona Crisis Center to determine if they should take additional action regarding Sabo. (ECF No. 32 ¶¶ 116-17; ECF No. 44 ¶¶ 116-17.) Strawser told the Crisis Center that Sabo threatened to harm herself after learning of her termination. (ECF No. 32 ¶ 118; ECF No. 44 ¶ 118.)

The Crisis Center informed Strawser "that there did not appear to be grounds for a 302 [involuntary] commitment." (ECF No. 32 ¶ 119; ECF No. 44 ¶ 119.) The Crisis Center also told Strawser it would visit Sabo's home "to perform a wellness check." (ECF No. 32 ¶¶ 119-20; ECF No. 44 ¶¶ 119-20.) Strawser contacted other UPMC Altoona staff and attempted to contact Sabo's boyfriend and sister. (ECF No. 32 ¶¶ 121-22; ECF No. 44 ¶¶ 121-22.)

Crisis Center employees visited Sabo's home and determined that she was not there. (ECF No. 32 ¶ 123; ECF No. 44 ¶ 123.) Crisis Center employees then asked Strawser to sign a "302

Petition" to have Sabo involuntary committed, but Strawser refused. (ECF No. 32 ¶ 123; ECF No. 44 ¶ 123.) Defendant alleges that Strawser did not sign the form because he was not present for Sabo's suicidal statements, but Sabo alleges that Strawser was present and contemporaneously aware of Sabo's threats of self-harm. (*Id*.) Strawser provided Crisis Center employees with Baughman's contact information. (ECF No. 32 ¶ 124; ECF No. 44 ¶ 124.)

After Sabo left UPMC Altoona on August 5, 2015, Baughman went to a movie. (ECF No. 52 ¶ 148.) After the movie, Baughman returned calls to Crisis Center employees about the 302 Petition. (*Id.* ¶ 148.) Baughman was initially hesitant to sign the 302 Petition but eventually signed it. (ECF No. 32 ¶¶ 125-26; ECF No. 44 ¶¶ 125-26; ECF No. 52 ¶¶ 148-50.) On the 302 Petition, Baughman noted that Sabo had a history of depression. (ECF No. 44 ¶ 116; ECF No. 52 ¶ 116.) Baughman testified that Crisis Center employees "told her what to write in the Petition." (ECF No. 52 ¶ 116.)

After leaving UPMC Altoona's premises, Sabo drove to the liquor store to acquire alcohol. (ECF No. 32 ¶ 128; ECF No. 44 ¶ 128.) That night, she consumed alcohol and Xanax (a prescription Benzodiazepine used for anxiety and panic disorder) in her car and fell asleep. (ECF No. 32 ¶ 129; ECF No. 44 ¶ 129.) Sabo claims that she attempted to commit suicide by consuming the alcohol and Xanax. (ECF No. 44 ¶¶ 129-30.)

Sabo returned to her home on the morning of August 6, 2015—the day after her termination. (ECF No. 32 ¶ 130; ECF No. 44 ¶ 130.) Police departments, investigators, detectives, and the UPMC Crisis Center were searching for Sabo that morning. (ECF No. 32 ¶ 131; ECF No. 44 ¶ 131.)

Sabo was admitted to UPMC Altoona's behavioral health unit on August 6, 2015. (ECF No. 32 ¶ 132; ECF No. 44 ¶ 132.) UPMC Altoona staff did not contact Sabo's family to inform them of Sabo's whereabouts. (ECF No. 32 ¶ 133; ECF No. 44 ¶ 133.) Defendant alleges that Sabo informed Crisis Center employees that she did not attempt suicide, but Sabo disputes that fact. (ECF No. 32 ¶ 135; ECF No. 44 ¶ 135.) Sabo was released from UPMC Altoona on August 8, 2015. (ECF No. 32 ¶ 136; ECF No. 44 ¶ 136.)

## B. Procedural History

Sabo filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on February 8, 2016 and with the Pennsylvania Human Resources Commission (PHRC) on February 6, 2016. (ECF No. 32 ¶¶ 146-47; ECF No. 44 ¶¶ 146-47.) The EEOC issued a Notice of Right to Sue on April 25, 2017. (ECF No. 1 ¶ 49.)

Plaintiff filed her Complaint in this Court on July 21, 2017. (*See id.*) Her complaint alleges seven counts: (1) discrimination in violation of the American with Disabilities Act; (2) discrimination in violation of the Pennsylvania Human Resources Act; (3) discrimination in violation of the Family and Medical Leave Act; (4) discrimination in violation of Title VII of the Civil Rights Act; (5) intentional infliction of emotional distress; (6) negligence; (7) negligence per se under the Pennsylvania Mental Health Procedures Act. (*See id.*)

From November of 2017 until July of 2018, the parties engaged in discovery. (*See* ECF Nos. 18, 24, 26.) Defendant filed its Motion for Summary Judgment on October 1, 2018. (ECF No. 30.) The Motion became ripe on February 11, 2019. (*See* ECF No. 59.)

## II. Jurisdiction and Venue

The Court has jurisdiction over this case under 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States. The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

Venue in this district is appropriate under 28 U.S.C. § 1391 because a substantial portion of the events underlying this case occurred in the Western District of Pennsylvania.

## III. Standard of Review

"Summary judgment is appropriate only where . . . there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000)

(quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11, (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

## IV.  Discussion

### A.  Sabo's Employment-Discrimination Claims

#### 1.  Count I—Defendant Is Not Entitled to Summary Judgment on Sabo's Claim Under the Americans with Disabilities Act

Count I of Sabo's Complaint alleges that Defendant unlawfully discriminated against her in violation of the Americans with Disabilities Act (ADA).  (ECF No. 1 ¶¶ 53-62.)  Sabo alleges that UPMC Altoona discriminated against her and ultimately terminated her due to her physical

and mental disabilities. (ECF No 1 ¶¶ 55-57.) Sabo also alleges that UPMC Altoona retaliated against her for complaining of disability discrimination. (*Id.* ¶¶ 58-60.)

Sabo brings her ADA claim under two distinct theories. First, Sabo alleges that Defendant unlawfully discriminated against her based on her disability. (ECF No. 1 ¶¶ 57, 60.)   ADA discrimination claims are sometimes referred to as disparate-treatment claims. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (noting that "disparate treatment is the most easily understood type of discrimination . . . the employer simply treats people less favorably" due to protected characteristics).   Second, Sabo alleges that Defendant unlawfully retaliated against her in violation of the ADA. (ECF No. 1 ¶¶ 58-59.)  The Court will separately analyze Sabo's claims under these two theories.

### a.      Sabo's Discrimination Claim Under the Americans with Disabilities Act

To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) that he or she is a disabled person as defined by the ADA; (2) he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he or she has suffered an adverse employment decision as a result of discrimination. *Evans v. Cernics, Inc.*, No. 3:14-cv-125, 2016 WL 4382751, at \*9 (W.D. Pa. Aug. 16, 2016) (Gibson, J.) (citing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)).

Defendant firstly argues that Sabo cannot establish a prima facie case of discrimination. Defendant concedes that Sabo was disabled for purposes of the ADA. (ECF No. 31 at 11.) And Defendant does not challenge that Sabo was qualified to perform the essential functions of her

-13-

job. Rather, Defendant alleges that Sabo cannot show causation because her supervisors were unaware of her depression and anxiety. (*Id.*)

Sabo responds to Defendant's first point by arguing that her supervisors knew that she was disabled due to her spinal stenosis, anxiety, and depression. (ECF No. 45 at 10.) She points out that UPMC Altoona managers—specifically Baughman, Strawser, Finochio, and Greene— were all aware that Sabo had taken FMLA leave. (*Id.*) Sabo argues that, accordingly, a jury could infer that these supervisors knew of her disability because she took FMLA leave. (*Id.*) Sabo further argues that her immediate supervisor, Baughman, knew of her disabilities. Baughman testified that she knew of Sabo's spinal stenosis. (*Id.*) And on the 302 Petition to involuntarily commit Sabo after her termination, Baughman affirmed that Sabo had a history of depression. (*Id.*)

The Court finds that there is a genuine issue of material fact as to whether Sabo's supervisors knew about her disabilities. It is undisputed that Baughman signed a 302 Petition stating that Sabo had a history of depression. (ECF No. 44 ¶ 116; ECF No. 52 ¶ 116.) This plainly shows that Baughman was aware of Sabo's mental-health related disability. While Defendant states that Crisis Center employees told Baughman to write that in the form, this is a factual dispute for the jury to resolve—especially given that Baughman signed the 302 Form subject to criminal prosecution for providing false information. (ECF No. 52 ¶ 116; ECF No. 58 at 2.) Moreover, a reasonable jury could infer that Sabo's FMLA leave informed her supervisors that she was disabled. Accordingly, Sabo has proffered sufficient evidence to preclude summary judgment on her prima facie case of discrimination under the ADA.

Under the *McDonnell Douglas* burden-shifting framework, the burden shifts from the plaintiff to the defendant after the plaintiff has established a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To fulfill its burden, the defendant must provide a legitimate, nondiscriminatory reason for its employment action. *Id.; Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003).

If a defendant provides a legitimate nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to produce evidence that the employer's reason is pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Raytheon*, 540 U.S. at 52. A plaintiff can prove that a defendant's proffered reason for an employment action was pretext for discrimination in two ways. First, a plaintiff can produce evidence showing that the defendant's alleged nondiscriminatory reason is so weak that it is "unworthy of credence." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 647-48 (3d Cir. 2015) (citing *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)). Second, a plaintiff can produce evidence by demonstrating any of the following: (1) that defendant previously discriminated against the plaintiff; (2) that defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated individuals outside the protected class more favorably. *Willis*, 808 F.3d at 645 (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 (3d Cir. 1998)).

Defendant argues that Sabo is unable to show pretext here. Defendant argues that Sabo cannot identify any competent evidence of a discriminatory motive for her discharge. (ECF No. 31 at 12.) It also argues that other disabled employees were not discriminated against and that UPMC Altoona decisionmakers did not make comments about Sabo's disability prior to her termination. (*Id.* at 12-13.)

Sabo responds by arguing that seniority—Defendant's reason for terminating Sabo after the reduction in force—is "classic pretext" for discrimination. (ECF No. 31 at 11.) Specifically, Sabo argues that "Baughman's testimony and notes establish that she and Strawser planned to 'get rid' of Sabo from the get-go, before they decided on [reduction in force] criteria and before they knew who was most senior."[3] (*Id.*) Sabo also argues that all five employee who Baughman chose to lay off in the reduction of force had a history of taking FMLA leave or other medical leave. (ECF No. 58 at 4.)

The Court finds that Sabo has shown pretext by alleging that when reducing the nutrition department's workforce, Baughman exclusively terminated employees who had utilized FMLA or other extended leave. Defendant does not dispute this fact. (*See* ECF No. 52 ¶¶ 90-91.) The Court finds that a reasonable factfinder could reject Defendant's explanation that Baughman reduced the workforce based solely on seniority. *Fuentes*, 32 F.3d at 766.

The Court's conclusion is consistent with a Third Circuit case discussing reductions in force. *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 237 (3d Cir. 1999). In *Showalter*, the plaintiff alleged age discrimination when he was laid off during a reduction in force. *Id.* The decisionmaker there determined the criteria for reducing the workforce, and chose to terminate employees based on departmental seniority. *Id.* The decisionmaker there had significant discretion in making the seniority determinations themselves because departmental seniority could be calculated three different ways. *Id.* The Third Circuit held that:

> [a] reasonable factfinder could conclude that [the defendant decisionmaker] had the discretion to choose any of the three forms of seniority; that he knew in advance the result that each choice would produce; and that he selected

---

[3] Plaintiff does not cite to record evidence in support of this argument.

department seniority because he knew it would result in the termination of the oldest employee, [the plaintiff].

*Showalter* is nearly identical to this case. Here, Baughman determined the criteria for the reduction in force. (ECF No. 44 ¶ 88, 93; ECF No. 52 ¶ 88, 93.) Although she chose to terminate employees based on departmental seniority, she could have used other criteria. (*Id.*) There is also a dispute as to how Baughman calculated seniority. (ECF No. 44 ¶¶ 92, 94.) And when Baughman learned about the reduction in force, she suggested to her supervisors that she could terminate one of the two certified dietary managers. (ECF No. 44 ¶ 73; ECF No. 52 ¶ 73.) When Baughman made that statement, she believed that Sabo was the least senior certified dietary manager, and therefore would be terminated. (ECF No. 44 ¶ 74; ECF No. 52 ¶ 74.) As a whole, the situation here is analogous to *Showalter* and shows that a jury could reject Baughman's explanation for the reduction in force, and instead determine that she made decisions knowing that Sabo would be terminated. Sabo therefore casts sufficient doubt on Defendant's proffered rationale for her termination and survives summary judgment on her discrimination claim under the ADA. Accordingly, the Court will **DENY** Defendant's Motion for Summary Judgment with respect to Sabo's ADA discrimination claim.

### b.  Sabo's  Retaliation  Claim  Under  the  Americans  with Disabilities Act

To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 653 (W.D. Pa. 2018) (citing *EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015); *Krouse*

*v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). "As with discrimination claims, retaliation claims under the ADA are analyzed under the *McDonnell Douglas* [burden-shifting] framework." *Jakomas*, 342 F. Supp. 3d at 653.

First, Defendant argues that Sabo cannot make out a prima facie case of retaliation under the ADA because she did not engage in protected activity. (ECF No. 31 at 14-15.) In response, Sabo argues that she engaged in protected activity by taking FMLA leave and subsequently complaining that her 2012-2013 performance review was negatively affected by her FMLA leave. (ECF No. 45 at 18.)

A protected activity is "opposition to an illegal employment practice" in a way that "identif[ies] the employer and the practice—if not specifically, at least by context." *Curay-Cramer v. Ursuline Academy of Wilmington, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) (citing *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995)). "A general complaint of unfair treatment is insufficient to establish protected activity." *Id.*

It appears that Sabo engaged in protected activity by complaining about her 2012-2013 performance review.[4] The parties do not dispute that Sabo complained about her 2012-2013 performance review. (ECF No. 32 ¶¶ 52-68; ECF No. 44 ¶¶ 52-68.) The parties also do not dispute

---

[4] It is unclear whether an individual has engaged in protected activity simply by taking FMLA leave. Plaintiff argues that "[Plaintiff] was punished because she took leave (a type of accommodation)—which is a form of disability discrimination." (ECF No. 45at 14 (citing *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 156-57 (3d Cir. 2017)).) In *Capps*, the court held that "a request for FMLA leave may qualify, under certain circumstances, as a request for reasonable accommodation under the ADA." 845 F.3d 144, 156-57. It appears that this statement was intended as dicta. Defendant, on the other hand, cites *Chapman v. UPMC Health Sys.*, 516 F. Supp. 2d 506, 532-33 (W.D. Pa. 2007). (ECF No. 31 at 15.) There, the Court held that "[t]he mere fact that an employee, like plaintiff, requires intermittent FMLA leave for a serious health condition does not mean that the employer is automatically on notice that the employee is 'disabled' as that term is defined under the ADA." *Id.* Therefore, it appears that an engages in protected activity by taking FMLA leave only when the employer is aware of the employee's disability.

that Sabo told Finochio at a February 11, 2014 meeting that Sabo believed she was discriminated against because she received a reduced performance review due to her FMLA leave. (ECF No. 32 ¶ 55; ECF No. 44 ¶ 55.) At the summary judgment stage, the Court must infer that Sabo's complaints implied disability discrimination. There are genuine disputes of material fact as to whether Sabo's supervisors knew of her disabilities. Further, Sabo requested accommodations immediately upon returning from her FMLA leave. Therefore, the Court finds that Defendant is not entitled to summary judgment on this basis because Sabo sufficiently alleges that she engaged in protected activity.

Second, Defendant argues that it is entitled to summary judgment on Sabo's ADA retaliation claim because Sabo cannot establish that Defendant's non-retaliatory motive for Sabo's termination was pretextual. (ECF No. 31 at 17-18.) The Court disagrees. As discussed in Section IV(A)(1)(a), the Court finds that a reasonable jury could determine that Baughman selected criteria for the reduction in force with the preordained intention of terminating Sabo. *See Showalter*, 190 F.3d at 237. Accordingly, the Court will **DENY** Defendant's Motion for Summary Judgment is with respect to Sabo's retaliation claim under the ADA.

### 2. Count II—Defendant Is Not Entitled to Summary Judgment on Sabo's Claim Under the Pennsylvania Human Relations Act

Count II of Sabo's Complaint alleges that Defendant violated the Pennsylvania Human Relations Act (PHRA) by discriminating and retaliating against Sabo on the basis of sex and disability. (ECF No. 1 ¶¶ 63-69.)

Under the PHRA, it is generally illegal for any employer to discriminate against an employee based on race, color, religious creed, ancestry, age, sex, national origin, non-job-related

handicap, or disability. 43 PA. CONS. STAT. § 955(a); *Conway v. Davey Tree Expert Co.*, No. 3:14-82, 2015 WL 1285837, at *4 (W.D. Pa. Mar. 20, 2015) (Gibson, J.). To bring a claim under the PHRA, an employee must file a complaint with the Pennsylvania Human Resources Commission (PHRC) within 180 days of the alleged discrimination. 43 PA. CONS. STAT. § 959(h).

Defendant argues that it is entitled to summary judgment on Sabo's PHRA claim because Sabo did not file a timely complaint with the PHRC. (ECF No. 31 at 7.) UPMC Altoona terminated Sabo on August 5, 2015. (ECF No. 32 ¶ 99; ECF No. 44 ¶ 99.) She did not file a complaint with the PHRC until February 8, 2016—188 days after her termination. (ECF No. 1 ¶ 49.)

Sabo argues that she is entitled to equitable tolling of the PHRA's 180-day period within which an individual must file a complaint with the PHRC. (ECF No. 45 at 10-12.) Equitable tolling is an equitable principle that extends a deadline whenever a plaintiff is unable to timely file a complaint, even when exercising due diligence. *See generally Sistrunk v. Rozum*, 674 F.3d 181, 190 (3d Cir. 2012) (citing *Holland v. Florida*, 560 U.S. 631, 645 (2010)).

Defendant argues that Sabo is not entitled to equitable tolling for two reasons. (ECF No. 51 at 6.) First, Defendant argues that Sabo is not entitled to equitable tolling because she did not allege equitable tolling in her complaint.[5] (*Id.*) Second, Defendant argues that Sabo's late filing is inexcusable because Sabo was represented by counsel in August 2015—five months before the expiration of the 180-day period. (*Id.*)

---

[5] The Court will not fully analyze this argument. It is well-settled that a plaintiff does not need to plead equitable tolling in its complaint. Rather, plaintiff merely needs to state facts that support equitable tolling. *Barrett v. Viacom, Inc.*, No. 04-608, 2008 WL 1818449, at *1 (W.D. Pa. Apr. 22, 2008) ("[I]t is necessary to plead the doctrine [of equitable tolling] *or facts in support thereof*.").

Sabo responds by arguing that she was entitled to equitable tolling of the PHRA's 180-day limitations period. (ECF No. 45 at 11.) She argues that the 180-day period should be equitably tolled because Sabo was unable to exercise her rights after her termination due to mental-health issues and her hospitalization. (*Id.* at 12.)

A plaintiff is entitled to equitable tolling when a plaintiff has "been prevented from filing in a timely manner due to sufficiently inequitable circumstances." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999). Equitable tolling occurs: (1) where the defendant has actively misled the plaintiff regarding the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights in the wrong forum. *Santos ex rel. Beato v. United States*, 559 F.3d 189, 197 (3d Cir. 2009).

Sabo argues that equitable tolling applies here because her involuntary commitment and subsequent medication use prevented her from asserting her rights. (ECF No. 45 at 12.) Further, Sabo argues that she was initially unable to assert her rights because she suffered from extreme panic, anxiety, and depression when the 180-day limitations period began to run. (*Id.*)

The Court finds that Sabo has raised a genuine issue of material fact as to whether she is entitled to equitable tolling on her PHRA claim. "Even though timeliness is a question of law, the applicability of a statute of limitations can involve fact-sensitive inquiries." *Steel Partners II, L.P. v. Aronson*, No. 05-cv-1983, 2006 WL 3782656, at *2 (D. N.J. Dec. 22, 2006) (citing *Haley v. Hendricks*, 83 F. App'x 452, 454 n.2 (3d Cir. 2003)).

"Mental incompetence is not a per se cause for equitable tolling." *Nara v. Frank*, 264 F.3d 310, 320 (3d Cir. 2001). Rather, to justify equitable tolling, the court must find that "the alleged

mental incompetence must somehow have affected the petitioner's ability to file a timely action."
*Campney v. Sec'y of Pa. Dep't of Corr.*, 469 F. App'x 113, 117 (3d Cir. 2012). To make this
determination, the court should consider: (1) whether the plaintiff was adjudicated incompetent;
(2) whether the plaintiff was institutionalized for mental impairment; (3) whether plaintiff
handled or assisted other legal matters during the limitations period; and (4) whether plaintiff
supported allegations of impairment with extrinsic medical evidence. *Id.* at 118 (citing *Passmore
v. Pa.*, No. 08-705, 2008 WL 2518108, at *3 (M.D. Pa. June 19, 2008)).

Sabo has raised a genuine dispute on whether she was prevented from asserting her rights
due to mental distress after her termination. It is undisputed that Sabo was involuntarily
committed to UPMC Altoona due to extreme mental distress for a three-day period following her
termination. (ECF No. 32 ¶¶ 132-36; ECF No. 44 ¶¶ 132-36.) Involuntary commitment is an
extreme circumstance that obviously prohibited Sabo from exercising her rights.[6] Sabo also
alleges that she was in a heavily medicated state whenever she left UPMC Altoona on August 8,
2019. (ECF No. 44 ¶ 155; ECF No. 52 ¶ 155.) Based on these facts, the Court must infer that Sabo's
extreme mental distress prohibited her from exercising her rights in the eight days following her
termination. And because Sabo filed her Complaint with the PHRA 188 days after her
termination, eight days of equitable tolling renders her Complaint timely.

---

[6] Some cases have held that "illness, even when it requires hospitalization, [is] not an extraordinary
circumstance that merits equitable tolling." *See Osorio v. Robert Packer Guthrie Hosp.*, No. 2:16-cv-149, 2016
WL 5122028, at *3 (W.D. Pa. July 22, 2016) (holding that travel, illness, and family issues are not
extraordinary circumstances for purposes of equitable tolling); *United States v. Humbert*, No. 04-506-1, 2010
WL 4665960, at *2 (E.D. Pa. Nov. 17, 2010) (holding that hospitalizations were not enough to satisfy the
extraordinary circumstances requirement); *United States v. Bronson*, No. 08-1502, 2009 WL 1813177, at *7-8
(W.D. Pa. June 25, 2009) (holding that sinus infection did not qualify as an extraordinary circumstance
warranting equitable tolling). However, as more fully discussed, the Court finds that Plaintiff's condition
rises to the level of extreme mental distress that justifies equitable tolling.

Moreover, the PHRA is a remedial statute. *See, e.g., Davis v. Jefferson Reg'l Med. Ctr.*, No. 2:06-cv-1094, 2007 WL 2752137, at *4 (W.D. Pa. Sept. 19, 2007). The Third Circuit has held that remedial statutes should be "liberally interpreted to effectuate the . . . purpose of ending . . . discrimination in employment." *Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 193 (3d Cir. 1997) (finding that the ADEA is a remedial statute). And courts have applied equitable tolling to the PHRA's 180-day time limit. *See, e.g., Altopiedi v. Memorex Telex Corp.*, 834 F. Supp. 800, 806 (E.D. Pa. 1993). This further weighs in favor of finding that Sabo is entitled to equitable tolling. The Court therefore finds that, especially at the summary judgment stage, it should construe the 180-day limitations period of the PHRA in favor of Sabo.

Defendant's second argument—that Sabo is not entitled to equitable tolling because she was represented by counsel before the expiration of the 180-day period—is unpersuasive. Plaintiffs are generally entitled to the full limitations period from the point where their claims accrue. *Oshiver*, 38 F.3d at 1386; *New Castle Cty. v. Halliburton NUS Corp.*, 111 F.3d 1116, 1124-25 (3d Cir. 1997). Because Sabo's claim did not accrue until sometime after her involuntary commitment, she is entitled to equitable tolling even though she retained counsel during the 180-day limitations period.

In conclusion, the Court finds that the extreme circumstances in this case may warrant equitable tolling of the 180-day limitations period. There are genuine factual disputes as to whether Sabo is entitled to equitable tolling and how long the limitations period should be tolled. The jury must make this determination. *See Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2007) (holding that factual determinations on whether a plaintiff is entitled to equitable tolling are

within the jury's province). Accordingly, the Court will **DENY** Defendant's Motion for Summary Judgment with respect to Sabo's PHRA claim.

### 3. Count III — Defendant Is Not Entitled to Summary Judgment on Sabo's Claim Under the Family and Medical Leave Act

Count III of Sabo's Complaint alleges that Defendant retaliated against her in violation of the Family and Medical Leave Act (FMLA) by giving her poor marks on a performance review, cutting off her access to EAP benefits, ignoring her complaints about FMLA retaliation, targeting her, and ultimately terminating her.[7] (ECF No. 1 ¶¶ 70-76.)

To establish a prima facie case of retaliation, an employee must point to evidence in the record that shows: (1) invocation of an FMLA right; (2) an adverse employment action; and (3) causation. *Anderson v. USPS*, No. 3:13-cv-135, 2015 WL 1245843, at *9 (W.D. Pa. Mar. 18, 2015) (Gibson, J.) (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)). The *McDonnell Douglas* burden-shifting framework applies to FMLA retaliation claims. *Id.* (citing *Szostek v. Drexel Univ.*, 597 F. App'x 50, 52 (3d Cir. 2015)).

Sabo clearly satisfies the first two elements of the prima facie case. It is undisputed that Sabo took FMLA leave in 2012 and 2013 as a UPMC Altoona employee. (ECF No. 32 ¶¶ 40-43; ECF No. 44 ¶¶ 40-43.) And there are genuine issues of material fact as to whether Sabo suffered adverse employment actions. "An 'adverse employment action' is an action that 'alters the

---

[7] Sabo suggests that she brings both discrimination and retaliation claims under the FMLA. (*See* ECF No. 45.) However, there are two types of claims under the FMLA — interference and retaliation. *See, e.g., Hayduk v. City of Johnstown*, 386 F. App'x 55, 59-60 (3d Cir. 2010). Here, Sabo does not bring an interference claim, which requires an allegation that defendant prevented plaintiff from exercising FMLA benefits. *See, e.g. Sarnowski v. Air Brooke Limosuine*, 510 F.3d 398, 401 (3d Cir. 2007). Here, Sabo does not allege that Defendant interfered with her right to exercise FMLA rights. Rather, Sabo alleges that Defendant retaliated against her after she utilized FMLA leave. Accordingly, the Court classifies Sabo's FMLA leave claim as a retaliation claim.

employee's compensation, terms, conditions, privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Budhun v. Reading Hosp. and Med. Ctr.*, 765 F.3d 245, 257 (3d Cir. 2014) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).

There is a genuine issue of material fact as to whether Sabo's poor performance ratings — which were allegedly reduced because of Sabo's FMLA leave — affected her pay. (ECF No. 52 ¶ 33.) Sabo also alleges that the conditions of her employment changed because she was required to attend EAP counseling after she complained about FMLA retaliation. (ECF No. 52 ¶¶ 48-49.) And finally, it is undisputed that UPMC Altoona terminated Sabo on August 5, 2015. (ECF No. 32 ¶ 99; ECF No. 44 ¶ 99.)

The key question is whether Sabo can show causation. To demonstrate causation, a plaintiff must show "either (1) an unusually suggestive proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Budhun*, 765 F.3d at 258 (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

Defendant argues that Sabo cannot show causation because there is not a suggestive temporal proximity between Sabo's protected activity and the allegedly adverse employment actions. The Court will conduct separate causation analyses for the each of the adverse employment actions that Sabo allegedly suffered.

The Court will firstly consider whether Sabo's FMLA leave caused a reduction in pay or a change in her employment conditions. Sabo alleges that her negative performance review caused a reduction in pay. (ECF No. 52 ¶ 27.) She received the allegedly retaliatory performance

review on December 17, 2013—after Sabo's second stint of FMLA leave, which ended in May of 2013. (*Id.* ¶ 27.) Although the negative performance review occurred more than six months after Sabo took FMLA leave, the performance review explicitly referred to Sabo's FMLA leave. (*Id.* ¶¶ 32-33.)

Similarly, Finochio referred Sabo to the EAP employee-counseling program—which allegedly changed the conditions of Sabo's employment—on February 18, 2014—soon after Sabo began complaining about her negative performance review. (*Id.* ¶ 44.) Accordingly, the Court finds that Sabo has created a genuine issue of material fact as to whether there was an unusually suggestive proximity between the protected activity and her negative performance review and referral to counseling.[8] Therefore, Sabo's FMLA retaliation claim survives summary judgment.

However, the Court finds that Sabo cannot demonstrate a causal link between her protected activity and her termination. Sabo was terminated on August 5, 2015—more than two years after she took FMLA leave and nearly two years after she complained of retaliation. Moreover, Baughman decided to terminate Sabo. But Baughman's predecessor, Finochio, gave Sabo the 2012-2013 performance review and referred Sabo to EAP counseling. Accordingly, the

---

[8] Courts have found "temporal proximity" when the alleged retaliation occurs, at the latest, a few months after a plaintiff's protected activity. *Compare Lichtenstein,* 691 F.3d at 307 (holding that termination less than a week after the exercise of protected activity established causation through temporal proximity) *with Bryson v. Regis Corp.,* 498 F.3d 561, 571 (6th Cir. 2007) (holding that three months was sufficient to establish causation through temporal proximity). In other situations, courts have found that two or three months is too distant to show an unusually suggestive temporal proximity. *See Williams v. Phila. Housing Auth. Police Dep't,* 380 F.3d 751, 760 (3d Cir. 2004) (finding that two months was not an unusually suggestive temporal proximity); *Palen v. Alcan Packaging,* 511 F. Supp. 2d 445, 449 (D. N.J. 2007) (finding that three months was not an unusually suggestive temporal proximity). While Sabo received the negative performance review more than six months after her FMLA leave, there is still an unusually suggestive temporal proximity because the performance review was based on Sabo's FMLA leave. In other words, the alleged retaliation was explicitly related to Sabo's performance review, even though it occurred six months after her FMLA leave.

Court finds that Sabo cannot establish a causal link between protected activity and her termination. Nonetheless, the Court will deny summary judgment on Plaintiff's FMLA claim because she adequately alleges a causal link between her protected activity and Defendant's retaliatory conduct—specifically the performance review that negatively affected her pay and her referral to counseling.

Defendant also argues that Sabo's FMLA claim is barred by the statute of limitations. Defendant argues that the alleged retaliation occurred in late 2013 and early 2014 and that Sabo did not file her Complaint until July 21, 2017. However, "an [FMLA] action may be brought . . . not later than two years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). Sabo's FMLA claim is not barred by the statute of limitations because she alleges that her termination—which occurred less than two years before she filed her complaint—forms part of her FMLA claim.

In conclusion, the Court finds that there are genuine disputes of material fact that preclude summary judgment on Sabo's FMLA retaliation claim. Accordingly, the Court will **DENY** Defendant's Motion for Summary Judgment with respect to Sabo's FMLA retaliation claim.

### 4. Count IV—Defendant Is Not Entitled to Summary Judgment on Sabo's Claims Under Title VII

Count IV of Sabo's Complaint alleges that Defendant violated Title VII of the Civil Rights Act of 1964 "by targeting and terminating her based on her gender, and by reassigning her position and duties to a male employee with far fewer years of seniority or experience." (ECF No. 1 ¶¶ 77-81.) Sabo also alleges that Defendant retaliated against her because she complained

about gender discrimination. (*Id.* ¶ 80.) Like Sabo's ADA claim, the Court will separately analyze Sabo's Title VII claim under discrimination and retaliation theories.

### a. Sabo's Discrimination Claim Under Title VII

Under Title VII, "an employer cannot discharge or discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's sex." *Bumbarger v. New Enter. Stone & Lime Co.*, 170 F. Supp. 3d 801, 825-26 (W.D. Pa. 2016) (Gibson, J.) (quoting *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009); 42 U.S.C. § 2000e-2(a)(1)).

To establish a prima facie case of gender discrimination, a plaintiff must establish that: (1) she is a member of a protected class; (2) that she was qualified for the position in question; (3) that she suffered an adverse employment action; and (4) retention by the employer of employees outside the protected class. *McNamara v. Susquehanna Cty.*, No. 3:17-cv-02182, 2018 WL 2183266, at *4 (M.D. Pa. May 11, 2018) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999)). The *McDonnell Douglas* burden-shifting framework applies to Title VII sex-discrimination claims. *Id.*

Defendant argues that it is entitled to summary judgment on Sabo's sex-discrimination claim because Sabo cannot fulfill the fourth element of the prima facie case. (ECF No. 31 at 8.) Defendant specifically argues that Plaintiff and Keith Auker—UPMC Altoona's executive chef— were not "similarly situated" because the duties of their jobs differed substantially. (*Id.*)

In response, Sabo argues that she and Auker were similarly situated because Sabo handled some of Auker's duties before he was hired. (ECF No. 45 at 11.) Sabo also argues that Auker assumed Sabo's job duties after her termination. (*Id.*)

In one line of cases, the Third Circuit has held that plaintiffs in reduction in force cases must show that the retained employee and the plaintiff were "similarly situated." *Lepore v. Lanvision Sys., Inc.*, 113 F. App'x 449, 452 (3d Cir. 2004) (citing *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 249-50 (3d Cir. 2002)). "In a reduction in force case, . . . employees who are 'similarly situated' . . . work in the same area [and] in approximately the same positions." *Id.* The Third Circuit has noted that "a plaintiff whose employment position is eliminated in a corporation reorganization or work force reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons." *Hook v. Ernst & Young*, 28 F.3d 366, 375 (3d Cir. 1994).

However, this Court recently clarified recent Third Circuit decisions in this area. "In precedential decisions, [the Third Circuit has held that] when there is a reduction in force, the fourth element to establish a prima facie case is relaxed." *Surman v. UPMC Presbyterian Shadyside*, No. 17-184, 2018 WL 4901107, at *8 (W.D. Pa. Oct. 9, 2018) (citing *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 294-95 (3d Cir. 1997)). In the reduction-of-force context, a plaintiff does not need to show that the retained employee and the plaintiff were similarly situated. *Id.* Rather, "plaintiff must simply proffer evidence that 'persons outside of the protected class were retained.'" *Id.* (citing *In re Carnegie*, 129 F.3d at 295); *see also Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999).

Here, Sabo fulfills the relaxed prima facie case. It is undisputed that Defendant retained executive chef Keith Auker—a male individual outside the protected class—after Sabo's termination. (*See* ECF No. 52 ¶ 94.)

The burden accordingly shifts to Defendant to proffer a legitimate, nondiscriminatory for its employment decision. At the summary judgment stage, Defendant simply needs to articulate a legitimate, nondiscriminatory reason—it need not be proven legitimate. *Marione v. Metro. Life Ins. Co.*, 188 F. App'x 141, 144 (3d Cir. 2006). Here, Defendant articulates a legitimate, nondiscriminatory reason for Sabo's adverse employment action by arguing that Sabo was discharged based on seniority.

Therefore, Sabo's sex-discrimination claim hinges on whether she can demonstrate a genuine dispute of material fact as to whether Defendant's reason for her termination was pretextual. As discussed in Section IV(A)(1)(a), the Court finds that a reasonable jury could determine that Baughman selected criteria for the reduction in force with the preordained intention of terminating Sabo. *See Showalter*, 190 F.3d at 237. There are genuine disputes of material fact as to how Baughman calculated seniority. (ECF No. 4 at 9-10.) There is no dispute, however, that Sabo was senior to Auker. (ECF No. 52 ¶ 94.) And because there is a genuine dispute about whether Auker and Sabo had similar job duties, the jury could infer that Defendant did not terminate Sabo based solely on seniority.

Moreover, a plaintiff may overcome an employer's proffered legitimate reason by showing that "the employer deviated from its normal policies and procedures for a layoff." *Kiesewetter v. Otis Elevator Co.*, 183 F. Supp. 3d 656, 659 (E.D. Pa. 2016) (citing *Tomasso v. Boeing Co.*, 445 F.3d 702, 709 (3d Cir. 2006)). Here, Defendant admits that Baughman did not consult UPMC Altoona's reduction-in-force policy when she made her termination decision. (ECF No. 52 ¶¶ 86-87.) Accordingly, the Court will **DENY** Defendant's Motion for Summary Judgment with respect to Sabo's sex-discrimination claim under Title VII.

## b.    Sabo's Retaliation Claim Under Title VII

Sabo also alleges that Defendant violated Title VII by retaliating against her for complaining about gender discrimination.[9]  (ECF No. 1 ¶ 80.)  To state a prima facie case of retaliation, a plaintiff must establish that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  *Surman*, 2018 WL 4901107, at *12 (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)).  Title VII retaliation claims operate under the *McDonnell Douglas* burden-shifting framework.  *Id.*

Defendant makes two arguments against Sabo's Title VII retaliation claim.  First, Defendant argues that Sabo did not engage in protected activity.  (ECF No. 31 at 15.)  Protected activity under Title VII is whenever an employee complains to management about discrimination so that "[i]t is possible [for management] to discern from the context of the statement that the employee opposes an unlawful employment practice."  *Surman*, 2018 WL 4901107, at *12 (citing *Jajua v. Diakon Lutheran Soc. Ministries*, 299 F. Supp. 3d 645, 656 (E.D. Pa. 2018)).

Sabo complained to Greene that Auker, unlike Sabo and the other female certified dietary manager, was not required to record his time or use paid time off when he was late.  (ECF No. 52

---

[9] Title VII provides that:

[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

¶ 53.) There is no dispute that Sabo complained to Greene about the time-recording issue. (*Id.* ¶ 58.) Defendant, however, disputes that Greene could have known that Sabo's comment related to sex discrimination. (*Id.*) In her deposition, Sabo admitted that she did not specifically use the word "discrimination" when she complained to Greene, but that she used the phrase "because he was a male." (*Id.*) The Court will infer that Greene could have discerned that Sabo's comment related to sex discrimination because she complained that the differential treatment was "because [Auker] was a male." (*Id.*) On a basic level, Sabo's complaint to Greene alleged that a male employee was being treated better than two female employees. *See Pajic v. Cigna Corp.*, No. 89-2404, 1990 WL 191939, at *8 (E.D. Pa. Nov. 30, 1990) (holding that complaints of perceived salary inequities between female and male managers was protected activity). Accordingly, Defendant is not entitled to summary judgment on this basis.

Second, Defendant argues that Sabo cannot establish pretext. (ECF No. 31 at 18.) As discussed in the preceding subsection, the Court finds that a reasonable jury could determine that Baughman selected criteria for the reduction in force with the preordained intention of terminating Sabo. *See Showalter*, 190 F.3d at 237. Therefore, the Court will **DENY** Defendant Motion for Summary Judgment with respect to Sabo's Title VII retaliation claim.

### B. Sabo's State Law Tort Claims

Sabo also brings three state-law tort claims. She brings claims for intentional infliction of emotional distress (Count V), negligence (Count VI), and negligence per se (Count VII). Before addressing these claims individually, the Court will address Defendant's argument that the Pennsylvania Workers' Compensation Act bars her state-law tort claims.

1. **The Pennsylvania Workers' Compensation Act Does Not Bar Sabo's State-Law Tort Claims**

Defendant argues that the Pennsylvania Workers' Compensation Act (PWCA) bars Sabo's state-law tort claims—for intentional infliction of emotional distress, negligence, and negligence per se—because the PWCA provides the exclusive remedy for claims arising in the employment context. (ECF No. 31 at 19.)

The PWCA provides that "[e]very employer shall be liable for compensation for personal injury to, or for the death of each employee, by an injury *in the course of employment.*" 77 PA. CONS. STAT. § 431 (emphasis added). Generally, the "course of employment . . . encompass[es] injuries an employee sustains while on or off the employer's premises if the employee is acting in furtherance of his employer's business." *Little v. W.C.A.B.*, 23 A.3d 637, 645 (Commw. Ct. 2011). The Pennsylvania Supreme Court has held that "the [PWCA] must be liberally construed to effectuate its humanitarian objectives," namely "to benefit the Pennsylvania worker." *Krawchuk v. Phila. Elec. Co.*, 439 A.2d 627, 630 (Pa. 1981) (citing *Bley v. Commonwealth Dep't of Labor and Indus.*, 399 A.2d 119 (Pa. 1979)).

Sabo argues that the PWCA does not bar her state-law tort claims because those claims arose from conduct after UPMC Altoona terminated her employment. (ECF No. 45 at 20-21.) The Court agrees. Sabo's state-law tort claims involve the conduct of UPMC Altoona employees after Sabo's termination. And although this conduct occurred on UPMC Altoona property, Sabo was not furthering UPMC Altoona's business when she left the premises after her termination.

Other courts have held that incidents occurring after an employee's termination are not "work injuries" covered by the PWCA. *See, e.g., Little*, 23 A.3d at 645 ("[W]here a work injury

appears to bear no relationship to events associated with employment activities, but rather relates to a final act that is only work-related insofar as the event alters the employment relationship (such as the termination in this case), an injury associated with that final act does not arise in the course of employment."). Here, Sabo's alleged injuries occurred during and after the "final act" of her termination. Accordingly, the Court finds that the PWCA does not bar Sabo's state-law tort claims.

###### 2. Count V—Defendant Is Entitled to Summary Judgment on Sabo's Intentional Infliction of Emotional Distress Claim

Count V of Sabo's Complaint alleges that UPMC Altoona employees intentionally inflicted emotional distress upon Sabo through outrageous and severe conduct. (ECF No. 1 ¶¶ 82-86.) Sabo argues that it was outrageous for Baughman and Strawser to allow Sabo to leave UPMC Altoona property after her termination because Sabo clearly became distraught and referenced suicide. (ECF No. 45 at 22-23.)

To prevail on an intentional infliction of emotional distress claim, a plaintiff must show: (1) the conduct of defendant was intentional or reckless; (2) the conduct of defendant was extreme and outrageous; (3) defendant's conduct caused emotional distress; and (4) the distress was severe. *See, e.g., Taylor v. Albert Einstein Med. Ctr.,* 754 A.2d 650, 652 (Pa. 2000).

"'Outrageous or extreme conduct' has been defined by the appellate courts [of Pennsylvania] as conduct that is 'so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society.'" *Id.* at 1122 n.5 (quoting *Hoy v. Angelone,* 720 A.2d at 745, 754 (Pa. 1998)). "[I]t has not been enough that the defendant has acted with intent which is tortious or even criminal, or that

he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Hoy*, 720 A.2d at 754 (quoting Restatement (Second) of Torts § 46 cmt. d (Am. Law. Inst. 1965); *Daughen v. Fox*, 539 A.2d 858, 861 (Pa. Super. Ct. 1988)). "Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have [] presented only the most egregious conduct." *Id.* (citations omitted); *see Doe v. Plum Borough Sch. Dist.*, 2:17-cv-00032, 2017 WL 3492542, at *11 (W.D. Pa. Aug. 15, 2017) (listing cases).

"[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988); *see Hoy*, 720 A.2d at 754. "In the context of a dismissal [from employment], it has been noted that 'while loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event' and cannot provide a basis for recovery for intentional infliction of emotional distress." *Cox*, 861 F.2d at 395 (quoting *Brieck v. Harbison-Walker Refractories*, 624 F. Supp. 363, 367 (W.D. Pa. 1985), *aff'd in relevant part*, 822 F.2d 52 (3d Cir. 1987)).

Here, the Court finds that Sabo's intentional infliction of emotional distress claim fails to the extent that it is based on her termination. It is well-settled that termination from a job is a legally insufficient basis for an intentional infliction of emotional distress claim. *Frankhouser v. Clearfield Cty. Career & Tech. Ctr.*, No. 3:18-cv-180, 2019 WL 1259570, at *16 (W.D. Pa. Mar. 19, 2019) (Gibson, J.); *Cox*, 861 F.2d at 395; *Brieck*, 624 F. Supp. at 367.

And Sabo's intentional infliction of emotional distress claim fails even if construed as arising from the conduct of UPMC Altoona employees after Plaintiff's termination. "There is no

cognizable claim [for intentional infliction of emotional distress] where the failure to act, i.e., negligence of a party, forms the basis of the claim." *Jackson v. Sun Oil Co. of Pa.*, 521 A.2d 469, 472 (Pa. Super. Ct. 1987) (citing Restatement (Second) of Torts § 46). Sabo's intentional infliction of emotional distress claim is based on UPMC Altoona employees—namely Baughman and Strawser—failing to affirmatively address Sabo's remarks that alluded to suicide. Put differently, Baughman and Strawser allegedly failed to prevent Sabo from leaving UPMC Altoona property or otherwise assist her. Their inaction is an insufficient basis for an intentional infliction of emotional distress claim.

In a similar case, a Pennsylvania court granted summary judgment on an intentional infliction of emotional distress claim where an individual may have threatened suicide after his employer terminated him.[10] *Jacques v. AKZO Int'l Salt, Inc.*, 619 A.2d 748, 754 (Pa. Super. Ct. 1993). The court there noted that "it is the conduct which must be outrageous, not the reaction to that conduct, to create a cause of action for intentional infliction of emotional distress." *Id.*

Here, Sabo fails to show that affirmative action by any UPMC Altoona employee was outrageous or egregious enough to sustain a claim for intentional infliction of emotional distress. She does not allege that UPMC Altoona employees insulted her. She does not allege that they affirmatively encouraged her to commit self-harm. The Court finds that UPMC Altoona employees did not affirmatively inflict emotional distress upon Sabo.

Therefore, the Court will **GRANT** summary judgment in favor of UPMC Altoona on Sabo's intentional infliction of emotional distress claim.

---

[10] The court recognizes that the Pennsylvania court employed a different summary judgment standard. However, the Court finds the opinion's analysis and application of Pennsylvania law to be insightful.

### 3. Count VI—Defendant Is Not Entitled to Summary Judgment on Sabo's Negligence Claim

Count VI of Sabo's Complaint alleges that Defendant was negligent. (ECF No. 1 ¶¶ 87-92.) Sabo alleges that Defendant owed her a duty of care because she was on UPMC Altoona property. (*Id.* ¶ 88.) Sabo alleges that Baughman and Strawser breached the duty of care by ignoring Sabo's suicide threats, thereby injuring her. (*Id.* ¶¶ 89-91.)

To prevail on a negligence claim under Pennsylvania law, a plaintiff must establish four elements: (1) a duty or obligation recognized by the law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of the duty or failure to conform to the standard by the defendant; (3) a causal connection between the defendant's conduct and the plaintiff's injury; and (4) actual loss or damage resulting to the plaintiff. *Hook v. Whiting Door Co.*, No. 3:15-cv-281, 2019 WL 630324, at *13 (W.D. Pa. Feb. 14, 2019) (Gibson, J.) (quoting *Catlin v. Hamburg*, 56 A.3d 914, 920 (Pa. Super. Ct. 2012)); *Freed v. Geisinger Med. Ctr.*, 910 A.2d 68, 72-73 (Pa. Super. Ct. 2006); *Wright v. Eastman*, 63 A.3d 281, 284 (Pa. Super. Ct. 2013); *Trask v. Olin Corp.*, 298 F.R.D. 244, 264 (W.D. Pa. 2014); *Kinney-Lindstrom v. Med. Care Availability & Reduction of Error Fund*, 73 A.3d 543, 563 n.17 (Pa. 2013).

In addition to her standard common-law negligence claim, Sabo also argues that Defendant breached its duty of care by violating Emergency Medical Treatment and Labor Act (EMTALA). The Court will separately analyze Sabo's negligence claims under a common-law theory and negligence per se theory under EMTALA.

### a. Sabo's Common-Law Negligence Claim

#### i. Defendant Owed a Duty of Care to Sabo

It is well-established that "[a] duty can arise from common law, by statute, or by contract." *AMCO Ins. Co. v. Emery & Assoc., Inc.*, 926 F. Supp. 2d 634, 642 (W.D. Pa. 2013) (quoting *Emerson v. Adult Cmty. Total Servs., Inc.*, 842 F. Supp. 152, 155 (E.D. Pa. 1994)); *Farabaugh v. Pa. Turnpike Comm'n*, 911 A.2d 1264, 1283 (Pa. 2006). "Whether a duty exists is a question of law for the trial court to decide." *Brisbine v. Outside In School of Experiential Educ., Inc.*, 799 A.2d 89, 95 (Pa. Super. Ct. 2002).

To determine whether a duty of care exists, the Court must weigh the following factors: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and the foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution. *Althaus ex. rel Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000).

There are conflicting interests at play when analyzing whether a duty of care exists in this case. On one hand, it seems unreasonable for an employer to allow a recently terminated employee to leave the premises unattended after that employee threatens suicide. On the other, Defendants point to the general rule under Pennsylvania law that there is not a duty to prevent suicide because "suicide constitutes an intervening act so extraordinary as not to have been reasonably foreseeable by the original tortfeasor." *McPeake v. Cannon*, 553 A.2d 439, 440-41 (Pa. Super. Ct. 1989).

The Court finds that the weight of the five *Althaus* factors indicate that Defendant owed Sabo a duty of care in this case. Here, there was a close relationship between the parties. Sabo

was an employee of UPMC Altoona. (ECF No. 32 ¶¶ 1-5.) Sabo's supervisors, Baughman and Strawser, accompanied Sabo to her car after her termination. (ECF No. 32 ¶ 109; ECF No. 44 ¶ 109.) Strawser and Baughman understood that Sabo expressed thoughts related to suicide—at least to some extent—after her termination. (ECF No. 32 ¶¶ 105-06, 108; ECF No. 44 ¶¶ 105-06, 108; ECF No. 52 ¶ 122.) For example, Baughman testified that "Sabo said something to the effect that she might as well just kill herself." (ECF No. 52 ¶ 108.) And as Strawser acknowledged, he knew there was some risk that Sabo would attempt suicide if they permitted her to leave the UPMC Altoona premises. (ECF No. ¶ 145.) As discussed more fully below, it is reasonable to impose a general duty of care on employers where a recently terminated employee expresses suicidal thoughts while still on the employer's premises. And finally, the public has an interest in requiring employers to react appropriately to suicide threats by recently terminated employees.

Moreover, Defendants' argument that there is not a duty to prevent suicide is not persuasive in this case. In *McPeake*, the Superior Court of Pennsylvania held that a lawyer did not have a duty to prevent his client from committing suicide. 553 A.2d at 442-43. The court there reasoned that "[b]ecause an attorney does not possess the ability either to perceive that a client is likely to commit suicide, or to prevent suicide, we will not impose liability upon him for failing to prevent a harm that is not a foreseeable result of prior negligent conduct." *Id.* at 443 (quoting *McLaughlin v. Sullivan*, 461 A.2d 123, 127-28 (N.H. 1983)).

However, there is one key difference between *McPeake* and the instant case. In *McPeake*, a criminal defendant jumped from a courtroom window after he was convicted of criminal charges. *Id.* at 440. After his suicide, the criminal defendant's family sued the decedent's attorney

for negligence on a legal malpractice theory. *Id.* There, the defendant-attorney did not have any notice of his client's suicidal intentions. *Id.* The *McPeake* decision rested on the assumption that lawyers generally cannot foresee when a client will commit suicide. *Id.* at 442-43. Moreover, there is no indication that the defendant-attorney was in a position to prevent his client from jumping out of the courtroom window. *Id.* But here, both Strawser and Baughman were aware that Sabo threatened suicide after her termination, and before they allowed her to leave the UPMC Altoona premises.[11] (ECF No. 31 at 22-23.)

Further, Strawser and Baughman could have taken simple steps to prevent Sabo's suicide attempt. They could have prevented Sabo from leaving the UPMC Altoona premises as they escorted her to her car. They could have informed Sabo's relatives of her termination and distressed state. And finally, they could have requested that Sabo seek mental-health treatment at UPMC Altoona's facilities. The Court therefore finds that *McPeake* is significantly different than this case.

Defendant also cites *Campo* and *Cooper* to support its argument that it did not owe Sabo a duty of care. Both these cases are also distinguishable. In *Campo*, a physician died after overdosing on drugs that he diverted from the hospital where he worked. *Campo v. St. Luke's*

---

[11] There is a genuine dispute of material fact about Plaintiff's suicide threats after her termination. (ECF No. 32 ¶¶ 105-06, 108; ECF No. 44 ¶¶ 105-06, 108; ECF No. 52 ¶ 122.) Defendant maintains that Baughman did not take Plaintiff's threats of suicide seriously. (ECF No. 31 at 22-23.) However, it is undisputed that Plaintiff made several separate statements to Baughman and Strawser indicating that Plaintiff may attempt suicide. *(See, e.g.,* ECF No. 32 ¶ 108.) Defendant attempts to characterize these as "statement[s] that Plaintiff would be better off dead." *(Id.)* However, in doing so, Defendant straightforwardly acknowledges that Plaintiff communicated suicidal intentions to Baughman. *(Id.* ("Ms. Baughman communicated *Plaintiff's threat to kill herself* [to Strawser] as a statement that Plaintiff would be better off dead.").) Accordingly, at the summary judgment stage, the Court must infer that both Baughman and Strawser were aware that Plaintiff threatened suicide.

-40-

*Hosp.*, 755 A.2d 20, 21-22 (Pa. Super. Ct. 2000). Before his death, the hospital was not aware of his drug problem. *Id.* His estate sued the hospital for negligence. *Id.* The court there found that the hospital had no duty to prevent the physician's death because the hospital could not have foreseen that the decedent would die of a drug overdose. *Id.* at 27.

In *Cooper*, a physician's superiors confronted him at work and accused him of abusing fentanyl. *Cooper v. Frankford Health Care Sys., Inc.*, 960 A.2d 134, 137 (Pa. Super. Ct. 2008). Two days later, the physician committed suicide. *Id.* His estate sued the hospital. *Id.* The Superior Court held that the hospital had no duty to prevent the plaintiff's suicide because it was not foreseeable that the decedent would commit suicide after being confronted about drug use at work. *Id.* at 147 (citing *McPeake*, 553 A.2d at 440-41).

But in both of these cases, like in *McPeake*, the hospitals were not in a position to prevent the plaintiffs' deaths because they were not plainly foreseeable. In *Campo*, the hospital was not aware of the decedent's drug problem. *Campo*, 755 A.2d at 22. And in *Cooper*, while the defendant-hospital was aware of the plaintiff's drug problem, the hospital's staff was not aware of the plaintiff's suicidal intentions. *Cooper*, 960 A.2d at 146. The instant case is therefore distinguishable because here, Baughman and Strawser knew that Sabo threatened suicide before she left UPMC Altoona's premises. (ECF No. 31 at 22-23.) Thus, Sabo's attempted suicide was more foreseeable than the suicides in *McPeake* and *Cooper*.

Accordingly, the Court is not convinced by these cases and finds that Defendant had a duty of care to take reasonable actions to attempt to prevent Sabo's reasonably foreseeable suicide attempt.

### ii.    The Jury Must Decide Whether Defendant Breached its Duty of Care

Typically, "the question of whether there is a breach of duty is a question of fact reserved for the jury." *Emerich v. Phila. Ctr. for Human Dev., Inc.*, 720 A.2d 1032, 1044 (Pa. 1998); *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 221 (Pa. 2018). Summary judgment is appropriate, however, where a rational fact finder would have no basis to conclude that defendant breached its duty of care. *Vanesko v. Marino Dist. Dev. Co., LLC*, 38 F. Supp. 3d 535, 541-42 (E.D. Pa. 2014).

Defendant argues that it did not breach a duty to Sabo because "it did not ignore Sabo's threats of suicide." (ECF No. 31 at 23.) Defendant argues, instead, that it fulfilled its duty of care because UPMC Altoona employees eventually reacted to Sabo's threats. (*Id.*) Defendant points out that its employees contacted the Crisis Center after Sabo left the premises, and that Baughman eventually signed a 302 Petition to have Sabo involuntarily committed.

The Court finds that a jury could accept Defendant's arguments. However, a reasonable jury could also determine that Defendant breached its duty of care to Sabo by allowing her to leave the hospital's premises after she threatened to commit suicide. Therefore, the Court finds that this factual dispute is properly left to the jury.

### iii.    The Jury Must Decide Causation

"Negligent conduct is not a ground for recovery unless it is a substantial factor in bringing about the plaintiff's injury." *Burnside v. Abbott Labs.*, 505 A.2d 973, 979 (Pa. Super. Ct. 1985) (citing *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978); *Heck v. Beryllium*, 226 A.2d 87, 90 (Pa. 1966); *Cuthbert v. City of Phila.*, 209 A.2d 261, 263 (Pa. 1965)). "It is not enough that a negligent act may be viewed, in retrospect, to have been one of the happenings in a series of events leading up to

an injury." *Polett v. Pub. Commc'n, Inc.*, 83 A.3d 205, 212 (Pa. Super. Ct. 2013) (citing *Eckroth v. Pa. Elec., Inc.*, 12 A.3d 422, 427 (Pa. Super. Ct. 2010)).

"The question of what is the cause of an accident is almost always one of fact for the jury." *Bleman v. Gold*, 246 A.2d 376, 380 (Pa. Super. Ct. 1968) (quoting *Ashby v. Phila. Elec. Co.*, 195 A. 887, 889 (Pa. 1938)); *Hamil*, 392 A.2d at 1284; *Feeney v. Disston Manor Personal Care Home, Inc.*, 849 A.2d 590, 595 (Pa. Super. Ct. 2004). To resolve questions of causation, the "fact-finder must consider not only what *did* occur, but also what *might* have occurred." *Hamil*, 392 A.2d at 1281. "Whether . . . defendant's negligent conduct was a substantial factor in bringing about the plaintiff's harm is normally a question of fact for the jury, and should only be removed from the jury's consideration where it is clear, as a matter of law, that reasonable minds could not differ on the issue." *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1371 (3d Cir. 1993) (quoting *Alumni Ass'n v. Sullivan*, 535 A.2d 1095, 1098 (Pa. 1987)).

Defendant argues that "Plaintiff cannot prove that Defendant's misapprehension of the import of her threats of suicide was the cause of her attempted suicide" because "Plaintiff's attempt at suicide operated as an intervening act that cut off Defendant's liability." (ECF No. 31 at 24 (citing *McPeake*, 533 A.2d at 442-43; *Rowe v. Marder*, 750 F. Supp. 718, 724 (W.D. Pa. 1990).

Here, the Court finds that a reasonable jury could determine that Defendant's failure to react to Sabo's suicidal statements before she left the UPMC Altoona premises caused her suicide attempt. Accordingly, the Court finds that the jury should resolve the issue of causation.

### b. Sabo's Negligence Per Se Claim Under EMTALA

Sabo also argues that Defendant breached its duty of care by violating EMTALA. (ECF No. 45 at 25-26); 42 U.S.C. § 1395dd. "Negligence per se is . . . an evidentiary presumption that a

-43-

defendant's violation of a legislative or regulatory enactment constitutes proof of a breach of duty." *Deitrick v. Costa*, 2015 WL 1606714, at *8 (M.D. Pa. Apr. 9, 2015) (citing *Daniel Boone Area Sch. Dist. v. Lehman Bros.*, 187 F. Supp. 2d 400, 407 (W.D. Pa. 2002)). "The concept of negligence per se establishes both duty and the required breach of duty." *Deitrick*, 2015 WL 1606714, at *8. The plaintiff still bears the burden of establishing causation. *Id.* (citing *Cabiroy v. Scipione*, 767 A.2d 1078, 1079 (Pa. Super. Ct. 2001)).

To establish the evidentiary presumption, the plaintiff must meet four requirements: (1) the purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally; (2) the statute or regulation must clearly apply to the conduct of the defendant; (3) the defendant must violate the statute or regulation; and (4) the violation of the statute or regulation must be the proximate cause of the plaintiff's injuries. *Cecile Indus., Inc., v. United States*, 793 F.2d 97, 99 (3d Cir. 1986); *Schemberg v. Smicherko*, 85 A.3d 1071, 1073 (Pa. Super. Ct. 2014).

Under EMTALA, when an individual with an "emergency medical condition" is on hospital property, "the hospital must provide either—(A) . . . further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility." 42 U.S.C. § 1395dd(a).

An "emergency medical condition" is "a medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of immediate medical attention could be reasonably expected to result in—(i) placing the health of the individual in serious jeopardy, (ii) serious impairment to bodily function, or (iii) serious dysfunction of any bodily organ or part." § 1395dd(e)(1).

Defendant firstly argues that Sabo cannot show that Defendant violated EMTALA. (ECF No. 51 at 9.) The Court disagrees. In this case, Sabo was obviously distraught on hospital property and made several remarks alluding to suicide. (ECF No. 32 ¶¶ 105-06, 108; ECF No. 44 ¶¶ 105-06, 108; ECF No. 52 ¶ 122.) While the parties dispute exactly what Sabo said, there is no dispute that Sabo made remarks about suicide after her termination. (*Id.*) Obviously, a suicidal individual can be reasonably expected to place her health in serious jeopardy. Further, courts have consistently found that patients with suicidal ideations (which Sabo was diagnosed with upon her involuntary commitment[12]) have "emergency medical conditions" under EMTALA. *See, e.g., Card v. Amisub (SFH) Inc.*, No. 03-2528, 2006 WL 889430, at *1, *3-*4 (W.D. Tenn. Mar. 30, 2006); *Hawkins v. Lincoln Cty.*, No 7:10cv5001, 2010 WL 2039656, at *6 (D. Neb. May 20, 2010); *Mahone v. Med. Ctr., Inc.*, No 4:17-cv-113, 2017 WL 6559911, at *9 (M.D. Ga. Dec. 22, 2017). Accordingly, the Court finds that there is a genuine dispute of material fact as to whether Sabo suffered from an emergency medical condition under EMTALA.

The Court notes that Sabo did not present herself at UPMC Altoona's emergency room. (ECF No. 51 at 9.) EMTALA applies when "any individual *comes to the emergency department.*" 42 U.S.C. § 1395dd. But under federal regulations interpreting EMTALA, EMTALA applies whenever an individual "[h]as presented on hospital property . . . [where] a prudent layperson observer would believe, based on the individual's appearance or behavior, that the individual

---

[12] Defendant disputes whether Sabo was diagnosed with "suicidal ideation." (ECF No. 52 ¶ 154.) While there is no evidence that Sabo was specifically diagnosed with "suicidal ideation," the treating physician who examined Sabo at the UPMC Altoona emergency room noted that Sabo "threatened suicide" and was "at high risk for suicide." (ECF No. 33-1 at 225.) The Centers for Disease Control defines "suicidal ideation" as "thinking about, considering, or planning for suicide." *See* CENTERS FOR DISEASE CONTROL, SELF-DIRECTED VIOLENCE SURVEILLANCE: UNIFORM DEFINITION AND RECOMMENDED DATA ELEMENTS 35 (2011), available at https://www.cdc.gov/violenceprevention/pdf/self-directed-violence-a.pdf.

needs emergency examination or treatment." 42 C.F.R. § 489.24. Here, Sabo's distraught condition on hospital property after her termination may have led a prudent observer to refer Plaintiff for emergency treatment or examination. Therefore, the fact that Sabo was on UPMC Altoona's premises implicates EMTALA. The fact that Sabo did not go to the UPMC Altoona's emergency room after her termination does not defeat her EMTALA claim.[13]

Defendant also argues that Sabo cannot raise a negligence per se claim at summary judgment because Sabo's Complaint does not specifically raise negligence per se in Count VI or otherwise mention EMTALA. (ECF No. 51 at 8-9.) The Court also disagrees with this argument.

Defendant cites *Al Makasaab* and *Deitrick* in support of this position. However, neither of these cases support Defendant's argument. In *Al Makasaab*, the Court held that "[u]nder [Federal Rule of Civil Procedure] 8(a), as long as an issue is pled, the party does not have to state the exact theory of relief in order to obtain a remedy." *Al Makasaab Gen. Trading Co. v. U.S. Steel Int'l Inc.*, 412 F. Supp. 2d 485, 500-01 (W.D. Pa. 2006). The court there dismissed the plaintiff's negligence per se claim because plaintiff did not plead negligence or negligence per se before summary judgment. *Id.* The instant case is distinguishable because Count VI of Plaintiff's Complaint clearly raises negligence. According to the logic in *Al Makasaab*, it follows that Sabo was not required to specifically plead negligence per se because she already pled the issue of negligence. Similarly, in *Deitrick*, the Middle District of Pennsylvania held that citation to a specific statute is

---

[13] It is undisputed that Baughman and Strawser were trained on EMTALA. (ECF No. 52 ¶ 125.) This further indicates that EMTALA applies on all hospital property, not just in the emergency department. It seems unlikely that Defendant would train Baughman and Strawser—two non-emergency room employees—on EMTALA if it did not apply to them in their daily duties.

not required so long as the complaint alleges particular conduct that clearly violates a statute.[14] *Deitrick v. Costa*, No. 4:06-cv-01556, 2015 WL 1606714, at *9 (M.D. Pa. Apr. 9, 2015). Here, Sabo's Complaint clearly alleges that Defendant ignored Sabo's suicide threats, thereby endangering her health. These allegations implicate EMTALA.

Therefore, Sabo may also proceed on a negligence per se theory in Count VI because there is a genuine dispute of material fact as to whether Defendant violated EMTALA. As the Court previously determined, there are genuine disputes of material fact as to causation that must be determined by the jury.

### 4. Count VII—Defendant is Not Entitled to Summary Judgment on Sabo's Negligence Per Se Claim Under Pennsylvania's Mental Health Procedures Act

Count VII of Sabo's Complaint alleges negligence per se based on violations of Pennsylvania's Mental Health Procedures Act (MHPA). (*Id.* ¶¶ 93-99.) MHPA requires mental health facilities to notify family or other individuals of an involuntarily committed patient's whereabouts and status. (*Id.* ¶¶ 95-96); 50 PA. CONS. STAT. § 7302(c).

As the Court previously stated, the elements of negligence per se are: (1) the statute must protect the interest of a particular group of people; (2) the statute must apply to defendant's conduct; (3) the defendant must violate the statute; and (4) the defendant's violation of the statute must cause the plaintiff's injury. *Cecile Indus.*, 793 F.2d at 99; *Schemberg*, 85 A.3d at 1073.

---

[14] A concern in these cases is that defendants may not have notice of the theory under which the plaintiff planned to proceed. *Deitrick*, 2015 WL 1606714, at *9; *Al Makaaseb*, 412 F. Supp. 2d at 500 ("Rule 8(a) does not permit the plaintiff to wait until the last minute to ascertain and refine their legal theories, especially if the defendant will be prejudiced."). Here, Defendant will not be prejudiced because Sabo did not wait until the last minute to raise a negligence per se theory. Sabo conducted discovery on EMTALA and Defendant stipulated that EMTALA applies to it. (ECF No. 58 at 10 n.10.)

Defendant argues that it is entitled to summary judgment on Sabo's MHPA claim because "its conduct is not covered by the MHPA for purposes of a negligence per se claim, which requires that there be a direct connection between the harm sought to be prevented by the statute and the purported injury."[15] (ECF No. 31 at 24-25; ECF No. 51 at 10.) The Court disagrees.

Section 7302(c) of the MHPA act specifically provides that:

> [u]pon arrival at the facility, the person shall be informed of the reasons for emergency examination and of his right to communicate immediately with others. He shall be given reasonable use of the telephone. He shall be requested to furnish the names of parties whom he may want notified of his custody and kept informed of his status. The county administrator or the director of the facility shall . . . give notice to such parties of the whereabouts and status of the person, how and when he may be contacted and visited, and how they may obtain information concerning him while he is in inpatient treatment.

50 PA. CONS. STAT. § 7302(c).

The MHPA is designed "to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy can be effected." 50 PA. CONS. STAT. § 7102. Further, "[t]reatment shall include diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery." 50 PA. CONS. STAT. § 7104.

---

[15] In its Brief in Support of its Motion for Summary Judgment (ECF No. 31), Defendant argues that it is entitled to summary judgment on Sabo's MHPA claim "because the MHPA does not provide for a private right of action and thus benefits the public at large as opposed to a particular class of individuals." (*Id.* at 24.) However, in its Reply Brief, Defendant "agrees that the MHPA provides for a private right of action, but it is important to note that it does so only for persons in treatment." (ECF No. 51 at 10.) The Court will not fully address this argument because it is undisputed that Sabo was "in treatment" at UPMC Altoona after her involuntary commitment on August 6, 2015. (*See* ECF No. 52 ¶¶ 152-54.)

The MHPA is clearly designed to apply to facilities that provide mental-health treatment, like UPMC Altoona. The notice provision in Section 7302(c) of the MHPA is a procedure that was enacted to supplement mental-health treatment for the patient. Its purpose is to ensure that the patient's support network is aware of the patient's treatment and able to assist to promote recovery.

Here, Defendant does not dispute that Defendant failed to contact Sabo's relatives (or other individuals) to inform them of her status. (ECF No. 52 ¶¶ 155-57.) And after Sabo was discharged, Defendant simply released her from the facility without contacting relatives or other individuals to inform them of her discharge. (*Id.*) Sabo also alleges that she was released in a heavily medicated state. (*Id.* ¶ 156.) This seems to be the scenario that the MHPA was designed to prevent. Accordingly, the Court will **DENY** Defendant's Motion for Summary Judgment with respect to Sabo's negligence per se claim under the MHPA.

## V. Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 30) is **GRANTED IN PART** and **DENIED IN PART**. Defendant's Motion is **GRANTED** with respect to Sabo's intentional infliction of emotional distress claim (Count V). Defendant's Motion is **DENIED** with respect to all other claims.

A corresponding order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBORAH SABO, | ) | Case No. 3:17-cv-135 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| UPMC ALTOONA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

AND NOW, this ___25th___ day of April, 2019, upon consideration of Defendant's Motion

for Summary Judgment (ECF No. 30), **IT IS HEREBY ORDERED** that the Motion is **GRANTED**

**IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendant's Motion is **GRANTED** with respect to

Count V for intentional infliction of emotional distress. Defendant's Motion is **DENIED** in all

other respects.

BY THE COURT:

_____

**JUDGE KIM R. GIBSON**
**UNITED STATES DISTRICT COURT**